### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### A.P.W. PRODUCTS CO., Respondent.

No. 258, Docket 27676.

United States Court of Appeals
Second Circuit.

Argued March 11, 1963.

Decided April 25, 1963.

Melvin Pollack, Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Gary Green, Atty., N. L. R. B., Washington, D. C., for petitioner.

Sidney A. Coven, Joseph Lepie, Boston, Mass., for respondent.

Benjamin Wyle, New York City and Warren Woods, Washington, D. C., submitted brief as attorneys for amicus curiae, United Paper-makers and Paperworkers, AFL–CIO.

Before MOORE, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge.

The National Labor Relations Board seeks enforcement of an order, 137 N.L.R.B. No. 7, in which, sustaining excep-tions of the General Counsel and the charging party to the report of its Trial Examiner recommending dismissal of the complaint, it found that respondent A.P.W. Products Co., Inc. had discharged Bernice Dagan because of her union ac-tivity and had thus violated § 8(a) (1) and (3) of the National Labor Relations Act; the Board accordingly directed her reinstatement with back pay, and fur-ther held that such pay should be com-puted without excluding the period be-tween the Trial Examiner's report and the Board's order, as had been the prac-tice established by E. R. Haffelfinger Co., 1 N.L.R.B. 760 (1936). The Board was unanimous in directing Dagan's rein-statement but divided 3–2 on the over-ruling of Haffelfinger. A.P.W. chal-lenges the order on three grounds: (1) that the finding of discriminatory dis-charge was not supported by substantial evidence on the record as a whole; (2) that Dagan's conduct after the discharge disqualified her from reinstatement, or alternatively, that before directing such relief the Board was bound to remand the case to the Examiner for findings on that issue; and (3) that the Board's reversal of its long-standing policy of tolling back-pay awards for the period between an examiner's report dismissing charges and a Board reversal was unlaw-ful on both substantive and procedural grounds. We grant enforcement.

The General Counsel's case against the discharge was presented primarily through Dagan; two other witnesses, Riley, a representative of United Paper-makers and Paperworkers, AFL–CIO, hereafter the Union, which had begun organizing activities at a new A.P.W. plant at Brattleboro, Vermont, and Gar-field, an employee on the night shift, added small details. A.P.W. called no witnesses as to the discharge.

Riley testified that on October 19, 1960, he passed out union handbills on A.P.W.'s property at the noon hour; that he was ordered off the premises by Kahn, its production manager; that, on leaving, he encountered Dagan in the parking lot and told her what had hap-

pened; and that she signed a union authorization card for him that day, apparently upon meeting him at the railroad station after finishing work, Dagan testified that Kahn had been watching from the office window as Riley passed out the union literature and as she took some, and that he also observed her subsequent conversation with Riley in the parking lot. Soon thereafter she undertook to pass out authorization cards to other employees. A week later Quinn, a supervisory employee, approached her during working hours, inquired about the organizing activity, and said "he knew I was for the union, even though I would not admit it." When she protested "that we had not ought to be talking union on company time," Quinn responded "that we could talk union all we wanted, the company did not object, as long as we were talking against it." On November 1 the Union sent Kahn a letter saying it had been designated as collective bargaining agent by a majority of the employees. Pursuant to an announcement on October 31, Kahn and Baum, a vice-president of A.P.W., met with the employees on November 2. Kahn said the meeting had originally been called to discuss financial benefits and grievance procedures, plans for which had been announced prior to October 31, but that this purpose had been frustrated by the letter just received from the Union. Baum expressed surprise over the Union's letter. There ensued a question and answer period in which Dagan took an extremely active part, being one of the two employee participants and using two-thirds of the time; she testified that Kahn showed irritation over her questions. On leaving the meeting she heard McGrath, the plant foreman, ask an employee, "Who?," in response to which the employee gave the name of Dagan and another, and she then saw McGrath write the other's name and her own first name on a pad. The next day an employee approached Dagan and accused her of conducting union activity in the plant; McGrath was nearby, although the Examiner found that he did not overhear the conversation. On November 11 Dagan was summoned to McGrath's office. He announced that Kahn, Baum and he "had arrived at the conclusion that my interests weren't with nor for the company, and for that reason 'A.P.W. Company and you are going to part company'." He admitted to her that her work had "always been above reproach" and that there were no reasons for her discharge other than as stated. Garfield's testimony added that in the early part of November, Carter, a night foreman, after saying the plant was too young for a union, told him that if the employee who ran the same machine on the day shift—to wit, Dagan—"didn't watch her step, she'd be on her way out."

The Trial Examiner found that the General Counsel had not discharged his burden of showing that A.P.W. knew of Dagan's union activity. He discounted the conversation with Quinn because of supposed discrepancies—which the Board was warranted in not finding significant—between Dagan's testimony at the hearing and an earlier statement she had made, and also because of a doubt—which the Board apparently did not share—whether Quinn's remarks were attributable to the company. He dismissed the remarks of McGrath at the time of Dagan's discharge on the basis that these "could have been used by McGrath to express his opinion or judgment that conduct by Dagan completely divorced from any connection with union activity and membership or other concerted activity showed that it was not to Respondent's interest that she be retained in its employ." He further found that "Dagan's testimony in regard to her disposition of the check Respondent sent to her in error discloses * * * that her credibility was not of the caliber that would justify accepting her testimony at face value, but, on the other hand, was of a nature that calls for a careful analysis of testimony."

This episode was as follows: When Dagan was discharged on November 11, she received a check of $40.63 for her

final week's work, drawn by a subsidiary of A.P.W. located nearby in New Hampshire. On November 17, A.P.W. sent her another check of $40.63, drawn by the A.P.W. payroll office in New Jersey, with the attached voucher stating it was for the same week. Dagan testified that she later called the Brattleboro plant—"I believe it was on December 9"—to inquire about the check, that she asked for the payroll department, that the woman who answered her call said A.P.W. must have felt the amount was due because "they had never been known to overpay anybody yet," and that she then cashed the check at the bank on the same day. Later she admitted she might have given the check to her garage in payment for repairs to her car; apparently this was what happened, and the check was cashed by the garage on December 9. From this the Trial Examiner drew the conclusion that Dagan "endorsed the check to the garage prior to the purported telephone call of December 9"—which seems to ignore the possibility of the check's being negotiated twice on the same day, as well as to give Dagan's testimony about the date a certainty it had not possessed. In January, a clerk in the Brattleboro plant called Dagan about the November 17, check; Dagan admitted having cashed it but claimed that A.P.W. owed her some money for bonus payments from October 31 to November 11 and for an automatic wage increase during her employment. The Board reversed the Examiner's finding that the discharge did not violate § 8(a) (3) and (1).

█ (1) It is plain that if the trial had been before the Board itself, a conclusion on its part that the General Counsel had sustained his burden of showing that Dagan was fired for union activity would be adequately supported. For the Board would have been entitled to believe Dagan, her testimony sufficed to create a *prima facie* case, and this would have made available the strong supporting inferences from A.P.W.'s failure to call witnesses primarily available to it, notably Kahn and McGrath, to rebut her testimony or to supply some innocent explanation of her discharge. See Interstate Circuit, Inc. v. United States, 306 U.S. 208, 225–226, 59 S.Ct. 467, 83 L.Ed. 610 (1939); Vanity Fair Paper Mills, Inc. v. F. T. C., 311 F.2d 480, 485–486 (2 Cir. 1962); 2 Wigmore, Evidence (3d ed. 1940), §§ 285, 290. On the other hand, if the Trial Examiner had announced at the close of the General Counsel's case that he proposed to recommend dismissal, an inference could hardly be drawn from A.P.W.'s failure to call witnesses whom it thought it had no occasion to produce; moreover, if such action by the Examiner had been on the basis that he regarded Dagan as a wholly incredible witness on the basis of demeanor, there would be grave question whether, under the criteria enunciated in Part III of Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 492–497, 71 S.Ct. 456, 95 L.Ed. 456 (1951), a finding of discriminatory discharge by the Board could stand. See Dyer v. MacDougall, 201 F.2d 265, 268–269 (2 Cir. 1952) (L. Hand, J., dictum); id. at 269–272 (Frank, J., concurring). But here the Examiner made no such statement at the close of the General Counsel's case, and hence A.P.W. cannot justifiably claim that it failed to produce witnesses within its control because the immediate trier of the facts had indicated that this was unnecessary. Moreover, the Examiner did not wholly reject Dagan's testimony, and such doubts as he expressed as to her credibility were based not on her demeanor but on matters of record as to which the Board could legitimately believe itself as competent to pass as he was. See F. C. C. v. Allentown Broadcasting Corp., 349 U.S. 358, 364–365, 75 S.Ct. 855, 99 L.Ed. 1147 (1955). The Board was within its rights in thinking he had been unduly sceptical as regards Dagan and unduly naive as regards the statement made by McGrath; on this basis a *prima facie* case had been established and, even on the rule that has been applied by the courts, which Dean Wigmore thought might warrant liberalization, see 2 Evidence, supra, § 290, fn. 12, the inference from A.P.W.'s non-produc-

tion of evidence within its control then came into play.

■ (2) Little need be said about A.P.W.'s contention that the check episode disqualified Dagan from relief or that, at least, the Board was bound to remand for a finding by the Examiner on that issue. While Dagan's conduct in keeping money which she must have known had been sent her by mistake was discreditable, it was not so evil, or such a threat to efficiency in the plant, that the Board would be barred as a matter of law from directing reinstatement and back pay; when tempers are aroused, as Dagan's seems to have been by what she regarded as an unwarranted discharge, people often act as they would not when in a calmer mood. On the procedural issue, § 8(a) of the Administrative Procedure Act says that when a subordinate officer who has heard the evidence makes the initial decision, the agency, on review or appeal, "shall, except as it may limit the issues upon notice or by rule, have all the powers which it would have in making the initial decision"; this must *a fortiori* be the case when, as is true in unfair labor practice proceedings before the Labor Board, the hearing officer merely recommends a decision. See 2 Davis, Administrative Law (1958), § 10.03, at 11–14; F.C.C. v. Allentown Broadcasting Corp., supra, 349 U.S. at 364, 75 S.Ct. at 859. The powers of an agency reviewing an initial or recommended decision of its examiner are greater than those of an appellate court reviewing the decision of a trial judge, as the Administrative Procedure Act and the Universal Camera and Allentown cases make clear; yet a court reviewing such a decision is not precluded from making its own findings on an issue not reached by the trial judge. Gediman v. Anheuser Busch, Inc., 299 F.2d 537, 547 (2 Cir. 1962), and cases cited.

(3) In the early case of E. R. Haffelfinger Co., 1 N.L.R.B. 760, 767 (1936), where the Trial Examiner had recommended dismissal of a discriminatory discharge complaint and was reversed, the Board in ordering reinstatement, said that although "Normally, we would also order back pay from the date of discharge * * *, in view of the Trial Examiner's recommendations, respondent could not have been expected to reinstate the discharged men after it received the Intermediate Report, and therefore it should not be required to pay back pay from that time to the date of this decision." The Board majority in the instant case, recognizing the existence of "a substantial body of Board decisions warranting the characterization of [such] tolling as a customary Board rule," thought that the reasoning of Haffelfinger did not bear analysis and that it operated "in the direction of benefiting the wrongdoer at the expense of the wronged—a result antithetical to the fundamental aim of the Board's remedial authority and powers." The majority pointed also to the contrary practice where a Board finding of non-violation has been reversed by a court of appeals and the Board thereafter orders back pay, and where comparable situations arise in private litigation. Hence it overruled, for cases arising under § 8(a) (3) and § 8(b) (2), Haffelfinger and the decisions following it. Respondent claims the Board was without substantive power to do this and, alternatively, that the Board could not do it by an adjudicative decision having retroactive effect under the procedure followed here.

■■ Respondent does not seriously argue that the non-tolling rule now announced would exceed the wide powers accorded to the Board in the framing of remedies if it had always been followed. Virginia Elec. & Power Co. v. N. L. R. B., 319 U.S. 533, 539–540, 543–544, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943). The contention is rather that the long-continued and well known practice of tolling, noted by the Supreme Court in Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 198 n. 7, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), had been frozen into the equivalent of a statutory mandate by the silence of Congress over a 26-year period which included major amendments of the National Labor Relations Act in 1947 and

1959. It is true that in N. L. R. B. v. Gullett Gin Co., 340 U.S. 361, 365–366, 71 S.Ct. 337, 95 L.Ed. 337 (1951), the Supreme Court, in sustaining the Board's practice of not deducting unemployment compensation payments from back pay, said that in view of the long-continued character of this practice, its recognition by the courts, and the thorough consideration given labor matters by Congress in 1947, "It is a fair assumption that by reenacting without pertinent modification the provision with which we here deal, Congress accepted the construction placed thereon by the Board and approved by the courts." But it is one thing to say that reenactment under such circumstances accepts an administrative practice in the sense of *negating* Congressional *disapproval,* and quite another to say that it accepts the practice in the sense of preventing a change. The Supreme Court distinguished Gullett Gin on precisely that ground, over a dissent by the author of that opinion, in N. L. R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 351–352, 73 S.Ct. 287, 97 L.Ed. 377 (1953), where it sustained the Board's change to a quarterly basis for computing back pay, saying that reenactment meant at most that Congress deemed the Board's previous practice to be authorized and that "if Congress had been more than satisfied with the Board's practice, if it had wanted to be certain that the Board would not in future profit by its experience, it would have had to do more than it did; it would have had to change the language of the statute so as to take from the Board the discretionary power to mould remedies suited to practical needs * * *."

The procedural argument in its broadest sweep is that a principle whereby back-pay awards will not be tolled by an examiner's finding of non-violation is a "rule," as defined by § 2 (c) of the Administrative Procedure Act —namely, an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy * * *" —and that the Board thus performed "rule making" in the instant case without the public notice and opportunity for comment prescribed in § 4. It is plain enough that the Board might properly have proceeded in that fashion, meanwhile permitting Dagan's case to take the same course as so many others had; indeed, much can be and has been said in favor of an agency's invoking the rule-making procedure when it wants to make rules. See Peck, The Atrophied Rule-Making Powers of the National Labor Relations Board, 70 Yale L.J. 729 (1961); compare N. L. R. B. v. E & B Brewing Co., 276 F.2d 594, 598 (6 Cir. 1960), cert. denied, 366 U.S. 908, 81 S. Ct. 1083, 6 L.Ed.2d 234 (1961). But our question is not of wisdom but of authority. Congress cannot have been blind to the fact that the adjudicative process of the agencies, like that of the courts, gives birth to "rules," which may apply for the past, for the future, or, more generally, for both. Compare §§ 4(b) and 8(b) of the APA. The short of it would seem to be that when an administrative agency makes law as a legislature would, it must follow the rule-making procedure prescribed in § 4, and when it makes law as a court would, it must follow the adjudicative procedure prescribed in §§ 5, 7 and 8; whether to use one method of law making or the other is a question of judgment, not of power. See Peck, supra, at 755.[1] Moreover—and here we move to another of A.P.W.'s objections— Congress could not have intended that when an agency creates law via the adjudicative route, it should never have the power, which courts have, to make a reversal of doctrine apply to the case before it as well as to situations that arise in the future. F.C.C. v. WOKO, Inc., 329 U.S. 223, 228, 67 S.Ct. 213, 91 L.Ed. 204

---

1. On some occasions when the N. L. R. B. has followed the adjudicative route, it has afforded persons other than the parties an opportunity to express their views as to a proposed major change in doctrine which it was considering. See Peck, supra, at 739.

(1946); Leedom v. International Brotherhood of Elec. Workers, 107 U.S.App. D.C. 357, 278 F.2d 237 (D.C. Cir. 1960). It is true that, as the Supreme Court pointed out in the second Chenery decision, Chenery Corp. v. S. E. C., 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947), an administrative agency, "unlike a court, does have the ability to make new law prospectively through the exercise of its rule-making powers, [and hence] has less reason to rely upon ad hoc adjudication to formulate new standards of conduct * * *" with retroactive effect. Thus, in addition to cases where the function of an administrative order as a future command precludes its retroactive overruling, Arizona Grocery Co. v. Atchison, T. & S. F. Ry., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932), there may be some instances where the adverse effects of retroactive overruling so far outweigh any possible benefits that administrative agencies may not properly exercise the power in question. Cf. Pederson v. N. L. R. B., 234 F.2d 417 (2 Cir. 1956). But this is not such a case. The decision related to a single employee, with a consequent minor financial impact, and it seems rather fanciful to suppose that A.P.W.'s failure to rehire Dagan between the Examiner's report on June 2, 1961, and the Board's order on May 2, 1962, long as that interval was, sprang from reliance on the Trial Examiner's favorable report or from the assumed lack of adverse financial consequences flowing from it.

A.P.W.'s final complaint is that it was given no notice that the Board proposed to change its policy as to tolling and thus had no opportunity to argue against this step. Section 5 of the APA requires that "In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing * * * (a) Persons entitled to notice of an agency hearing shall be timely informed of * * * (3) the matters of fact and law asserted." Although this scarcely includes notification of what the precise consequences of adverse action by the agency will be, the spirit of this provision ought to have led the Board to give notice of an intention to alter a remedial practice of long standing.

It is not apparent why, in the ten months that the Examiner's report was before it, the Board could not have found means to inform the parties—and other interested persons—that overruling of its tolling rule was being considered and to give them some opportunity to express their views.[2] Although even the highest tribunal has been known to overrule its own precedents, on matters of some moment, though the issue had not been argued before it, we might well remand to permit A.P.W. an opportunity to argue this issue to the Board if any purpose would be served thereby. But it is manifest that this would be an exercise in futility—the arguments A.P.W. would make on remand have already been made by the dissenting members and rejected by the majority. Although we thus do not altogether approve the procedure here, we nevertheless grant enforcement.

2. The Board stated in its decision that it had "given extensive consideration to the practice of tolling monetary awards, such as back pay, in these circumstances as part of our study of the adequacy of the Board's remedial orders," and cited a speech made by the Board's Chairman on September 13, 1961, before the national convention of the Federal Bar Association. In this the Chairman mentioned "the apparent ineffectiveness of our remedies in many cases," and stated that "we * * * are now studying various ways of taking the profit out of unfair labor practices * * *." We have been given no more precise information as to the nature and method of the Board's "study"—whether, for example, it included an opportunity for any outside parties to express their views. In concluding its explanation of the decision here, the Board relied solely on "our examination of the equities of the situation, an analogy to court procedures, and our experience."