PUERTO RICO LABOR RELATIONS BOARD, Petitioner, *v.* METROPOLITAN BUS AUTHORITY, Defendant; SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, ETC., ET AL., Interveners.

No. JRT-64-2.       Decided December 4, 1964.

*J. B. Fernández Badillo,* Solicitor General, *José Orlando Grau,* and *Luis M. Rivera Pérez* for petitioner. *José Raúl Cancio* for defendant. *Sarah Torres Peralta* and *Ginoris Vizcarra* for S.I.U. *Nicolás Nogueras, Jr.,* for U.T.A.M.A.

Division composed of Mr. Justice Blanco Lugo, as Chief Judge of Division, pro tempore, Mr. Justice Dávila, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

The Puerto Rico Labor Relations Board has requested this Court to enforce an order of that agency directed to the Metropolitan Bus Authority requiring the latter:

"To take the following affirmative action to effectuate the purposes of the Puerto Rico Labor Relations Act:

"(a) To deliver to the Seafarers International Union (Puerto Rico Division) the amount of the check-off dues of the operating and maintenance employees of defendant from the week commencing September 26, 1962 to the week ending January 1, 1963.

"(b) To serve notice on the Chairman of the Puerto Rico Labor Relations Board, within ten (10) days after the date of such order, of the actions taken to comply with the order."

The defendant answered. It alleged that it had been willing to comply at all times, in good faith,[1] with the terms of the order copied, and that as a result of the claim of the dues deducted by two different labor organizations—the Seafarers International Union and the Union of Workers of the Metropolitan Bus Authority—"in view of the justified fear of having to pay twice," it had elected to deposit the amount thereof with the clerk of the Superior Court, San Juan Part, with the evident purpose that the judicial authority may determine definitively to which of the two entities the sum so deposited shall be paid.[2] It alleged all these reasons in order to account for its nonperformance, and ended by acquiescing to the issuance of the corresponding decree enforcing the Boards' order in its entirety, provided it was protected against the possibility of having to pay twice the checkoff dues.

In view of the fact that the action sought unquestionably affected the Seafarers International Union of North

---

[1] In support of this assertion it cites paragraph 4 of the Board's petition which reads: "To this date it has been impossible to comply with the order copied above because the Union of Workers of the Metropolitan Bus Authority claims the dues referred to above, and has brought different legal actions to prevent the Defendant from complying with the Order entered by the Petitioner."

[2] As a result of the different claims on the amount of the checkoff dues, several actions were filed in the Superior Court, San Juan Part, which at the Board's request and as an incident to protect our jurisdiction in the present appeal we stayed by order of April 8, 1964, to wit: (1) Civil case 62-7685, *Ex parte Metropolitan Bus Authority,* on Trusteeship; (2) Civil case 63-201, *Seafarers International Union v. Metropolitan Bus Authority,* on Collection of Money; (3) Civil case 64-40, *Union of Workers of the Metropolitan Bus Authority,* on Declaratory Judgment; and (4) Civil case 64-209, *Seafarers International Union, etc. v. Metropolitan Bus Authority,* on Damages. In the first two actions, which were consolidated for the purpose of disposition, judgment was rendered on November 27, 1963 decreeing their dismissal on the ground that the Labor Relations Board had assumed jurisdiction over the matter "in the exercise of its exclusive power, as consecrated in § 7 of the Puerto Rico Labor Relations Act." A motion for reconsideration was denied on December 16. A motion to dismiss the complaint in Civil case 64-40 was granted on March 31, 1964, for identical reasons.

America (Puerto Rico Division) and the Union of Workers of the Metropolitan Bus Authority, we granted them a term to allege whatever suited their right. Both did.

The S.I.U. requested that the order be enforced and also that it be modified to include a pronouncement on the payment of interest "for the violation of its rights by defendant."[3]

The U.T.A.M.A. alleged that (a) the Board's request was not in order, since the determination of the entity entitled to the checkoff dues was a matter which called for adjudication of private rather than public rights, wherefore the said agency lacked jurisdiction; (b) the decision and order affects more than 1,000 of defendant's workers as well as the union representing them at present, without their being parties in the unfair-practice proceeding before the Board; (c) the deposit by defendant of the amounts deducted relieves it from further obligation and removes the settlement of the dispute to the ordinary courts of justice as the proper forum for such purpose; and (d) in any event, the proper action would be to order that the funds be delivered to the union which represents the workers at present.

Thus far the dispute as posed in the averments. For a better understanding of all the questions involved, it is necessary to sum up, in a general way, the turbulence and rapid changes which have characterized the labor-management relations in the Metropolitan Bus Authority.

---

[3] The Seafarers had filed with us a petition for enforcement of the Board's order, which was entered under No. JRT-64-1. Within this proceeding it did not move for modification to include interest. We dismissed the petition upon taking cognizance of the present appeal.

In the report of October 29, 1963 of the official examiner it was expressly recommended that no payment of interest be imposed, considering that (1) this was the first time in which a charge of this nature, based on the facts already recited, was filed; (2) complainant union was an organization of recognized solvency, which enabled it to continue complying with its obligations as representative of the laborers.

—I—

## THE FACTS AND THE CHARGE OF UNFAIR PRACTICE[4]

A—THE FACTS

From and after 1949 the Metropolitan Bus Authority has bargained collectively with the labor organization certified by the Labor Relations Board as the representative of a majority of its employees in the appropriate contracting unit. Originally the labor organization was Union No. 1 of Chauffeurs and Mechanics of San Juan and Affiliated Branches, Inc., which afterwards changed its name to that of Union of Transportation Workers of Puerto Rico, IBL-AFL-CIO. Empowered by the certification, in June 1959 this union negotiated an agreement with the enterprise which would expire on December 31, 1962, whose article VII on check-off[5] provided as follows:

"The Authority agrees to deduct from the salary or wage received by the employees covered by the contracting unit the monthly dues agreed upon at a duly constituted assembly of the Union. The Secretary-Treasurer of the Union, with the approval of the President, shall send to the Authority a certification of such agreement for proper action. The amount of money so deducted shall be delivered monthly to the Secretary-Treasurer of the Union together with a copy of the payroll

---

[4] For this summary of the facts we depend on the disclosures of the proceedings before the Board in case CA-2765, within which the records which gave rise to decisions 273 and 304 of the Board were offered in evidence.

[5] At the time this agreement was signed § 5 of Act No. 17 of April 17, 1931, 29 L.P.R.A. § 175, permitted the employer to deduct from the laborer's wages the union dues stipulated in a collective labor agreement, and required the posting of a bond by the treasurer or official designated to receive such dues. The amendatory acts retain substantially the same wording. The authorized deduction of dues appears at present in the body of the section as subd. (d), 29 L.P.R.A. § 175 (Supp. 1963, p. 125). See, also, § 8 (1) (b) of the Labor Relations Act, 29 L.P.R.A. § 69.

or a list of the personnel to whom the deduction has been made."

In March 1962 a large number of employees included in the contracting unit constituted a nucleus of opposition to the certified union, and sought the help of the Seafarers International Union (Puerto Rico Division) to present the corresponding request for investigation and certification as representative. An affiliation between the group of laborers and that international union did not properly exist, but their relations were characterized by certain peculiar conditions which, in fact, amounted to the recognition of the autonomy of the local entity to deal with its problems, especially as respects the bargaining agreements.[6] On May 21, 1962, the Board ordered elections to be held, and they took place on June 6. The "dissenting" nucleus which had been fighting for some time the management of the U.T.T. and which went to the elections as Seafarers International Union, obtained a majority. Consequently, on June 13 the Board certified the S.I.U. as the appropriate unit and exclusive

---

[6] On May 17, 1962, Keith Terpe and Felipe de Jesús, President and Executive Secretary respectively of the S.I.U., declared under oath:

"1.  That the Seafarers International Union, Puerto Rico Division, *shall indorse the autonomy* of the Transportation Union of Puerto Rico. The workers of the A.M.A. shall have their own charter, elect their own board of directors, bargain their own collective agreements, and administer and direct their Union freely.

"2.  That the Seafarers International Union, Puerto Rico Division, recognizes and shall recognize the right of the workers of the A.M.A. to administer and conserve their properties. These properties shall be the *exclusive property* of the workers of the A.M.A., and the Seafarers International Union, Puerto Rico Division, cannot, nor shall, intervene in the management and use of their properties by the workers of the A.M.A. This is a right of the workers of the A.M.A. and we *SHALL RESPECT* that right.

"3.  That the Seafarers International Union, Puerto Rico Division, shall give its full moral, economic, legal, and physical support to the workers of the A.M.A., and we declare that the Seafarers International Union, Puerto Rico Division, shall continue to indorse the workers of the A.M.A. in their struggle against the tyranny and the dictatorship existing in their Union and shall stand side by side with the workers."

representative of the workers. It is fair to recognize that the moral and economic support given by S.I.U. to the local group practically insured its success in the elections.

On June 19 and 20 the workers held a meeting at which they designated their board of directors, the delegates to handle complaints and grievances and for the welfare fund, and adopted other measures for the administration of the existing collective agreement.[7] There is no question that both the certified union and the employer impliedly accepted that the relations between both of them should continue to be governed by the contract which would expire on December 31, perhaps because of the proximity of the expiration of the period of effectiveness.

Hardly three months had elapsed since the certification when late in September 1962 a certain unrest began to be felt among the workers because of the uncertainty respecting the special relation existing between the local group and the S.I.U. Impatient because the promise of autonomy had not materialized in a more tangible form, the directors called on Terpe for the purpose of inquiring on the forthcoming bargaining agreement and the stabilization—through a simple affiliation—of the local with the international organization. Apparently the vagueness of Terpe's statements at this conversation, coupled with his exaggerated insistence that the certification had been issued directly to the S.I.U., aroused certain fear in the directors which convinced them of the need for calling the members to consider the situation. Among other things, the same day of the conversation the directors wrote a letter to the enterprise requiring it to initiate conversations to discuss the new agreement. It was

---

[7] It is well to point out that on July 11 the S.I.U. wrote a letter to the enterprise stating that the Secretary-Treasurer recently elected would not furnish any bond because the laborers were directly affiliated to that union, and that the funds accruing from dues were not under the immediate custody of that officer but were covered into the S.I.U.

signed "Union of Workers of the A.M.A., affiliated to the S.I.U."

The relations between the group and the S.I.U. deteriorated rapidly. An assembly was held on October 2 and 3 which was attended by 470 workers. The decisions made reveal the complete and definitive split between that group and the S.I.U. The Union of Workers of the Metropolitan Bus Authority was constituted and it was agreed: (a) to petition the A.M.A. to discontinue the deduction of dues to the laborers to be delivered to the S.I.U.; (b) to withdraw the authorization of the S.I.U. to intervene in the new bargaining agreement; (c) to fix a quota for expenses of the local group; and (d) to substitute the Secretary-Treasurer, who had continued to be loyal to the S.I.U., by Ismael Vargas. Notice of all these agreements was served on the employer on October 4.

In view of this situation, on October 9 the A.M.A. withheld the dues deducted and started to deposit them with the clerk of the Superior Court.

On October 10 the U.T.A.M.A. filed a petition for certification with the Labor Relations Board. On December 11 this agency ordered elections to be held,[8] and having been held on the 27th, the U.T.A.M.A. obtained an absolute indorsement as evidenced by the result of an 863 to 6 vote. On January 2, 1963, the Board certified the U.T.A.M.A. as the exclusive representative of the workers for the purposes of collective bargaining, which recognition subsists at the present time.

In the meantime, what happened in the administration of the agreement during the period between October 9 and December 31, 1962? Let us see. 1—On October 17 the S.I.U.

---

[8] The S.I.U. sought before this Court the review of the election order, and on December 21 we declined to issue the writ. The National Supreme Court denied a petition for certiorari to review our order, 372 U.S. 914 (1963).

substituted the delegates in the different shops of the enterprise by letter addressed to it, stating further that both these delegates and the representatives in the Grievance Committee would be those to be designated by the S.I.U. In answer to this letter, the employer took note of the designations and stated that *"We do not believe that there is any problem as to the administration of the present agreement.* Up to the present time the S.I.U. is the union certified as the representative of the workers comprised in the appropriate unit. The situation is different as respects your petition to negotiate a new collective agreement. A petition having been filed to investigate and settle a dispute on representation . . . we cannot initiate negotiations on collective agreement." 2—Up to October 29 the employer had meetings with the representatives designated by the S.I.U. to hear the complaints and grievances, but on that date the shop employees carried out a protest stoppage to signify their disapproval of the manner in which that committee was constituted. For that reason the General Manager of the A.M.A. wrote a letter to Terpe stating that "under the prevailing circumstances, I shall not meet again with your representatives nor call any committee to a meeting for the administration of the present collective agreement until such time as you offer guarantees that the Union which you represent has effective control over the employees." 3—The enterprise continued writing letters to the S.I.U. pursuant to the clauses of the agreement. 4—Since September 29 no expenditures were authorized from the Welfare Fund, but its trustees—including the representatives designated by the S.I.U.—continued to meet to administer the same. The U.T.A.M.A. did not participate in this activity. It may be asserted that during this period the U.T.A.M.A. did not intervene in any manner whatsoever in the administration of the existing agreement.

B—THE CHARGE OF UNFAIR PRACTICE

On October 9, 1962, the Seafarers International Union filed a charge of unfair labor practice against the Metropolitan Bus Authority within the meaning of subds. (a), (b), (d), and (f) of § 8(1) of the Act.[9] The charge was amended two weeks later, and it was alleged therein that the conduct of the enterprise was repugnant to the statute in (a) depositing the dues deducted to the laborers and refusing to deliver them to the certified union, in violation of the terms of the existing collective agreement; (b) unduly helping the U.T.A.M.A. which was a "rival union"; (c) refusing to bargain collectively with complainant union; and (d) bargaining with an uncertified labor organization.

On April 25, 1963, after the elections were held in which the U.T.A.M.A. was the winner and was accordingly certified as the exclusive representative for the purposes of collective bargaining, the Chairman of the Board issued a notice for a hearing and dismissal of charges setting forth that he would not issue any complaint respecting the averments contained in paragraphs (b), (c), and (d) above, and summoning the A.M.A. and the U.T.A.M.A. to a hearing to show cause why the attorneys for the Board should not be ordered to appear before the Superior Court, San Juan Part, to request that the funds deposited be delivered to

---

[9] The said subdivisions, 29 L.P.R.A. § 69, in their pertinent part read as follows:

"(a) To interfere with, restrain or exercise coercion upon, or to attempt to interfere with, restrain or exercise coercion upon his employees in the exercise of the rights guaranteed in section 65 of this title.

"(b) To intiate, create, establish, dominate, interfere with or attempt to initiate, create, establish, dominate or interfere with the formation or administration of any labor organization, or to contribute financial or other support to the same . . . .

"(c) .     .     .     .     .     .     .     .

"(d) To refuse to bargain collectively with the representatives of a majority of his employees in a unit appropriate for collective bargaining . . . .

"(f) To violate the terms of a collective bargaining contract . . . ."

the S.I.U.[10] On August 6 Mr. Miguel Velázquez Rivera, who had acted as trial examiner, submitted a report in which he found that the S.I.U. was entitled to recognition of the power to receive and to use the amount of the dues deducted from the time of deposit until certification of the U.T.A.M.A. as the exclusive representative of the workers in the appropriate unit.

On September 27 the Chairman of the Board ordered the Legal Division of that agency to file the corresponding complaint on the basis of the charge of violation of the agreement. The order was executed on the same day. The hearing was held on October 16. From the report of the trial examiner it appears that "Mr. Nicolás Nogueras, attorney for the Union of Workers of the Metropolitan Bus Authority, did not appear although he was duly served with notice of this proceeding and before it was commenced steps were unsuccessfully taken to locate him in his offices." We have referred to the decision and order of the Board at the outset of this opinion. In order to account for its action, it says in part: "In the past we have considered that in cases of performance of obligations arising from a collective agreement the best rule is to exact performance of the agreement by the union concerned until the latter is substituted by another. . . . We thus make clear for employers and labor organizations the cardinal principle of our Law that collective agreements must be literally performed, and we further make clear to the employees that whenever they designate a collective representative they are obligated to contribute to its support."

---

[10] On November 21, 1963, the Board appeared in the consolidated actions to which we have referred in n. 2, and moved for dismissal for lack of jurisdiction, together with a copy of its decision and order.

It also appeared on January 16, 1964, in the action for declaratory judgment and made the same contention.

—II—

## THE JURISDICTIONAL QUESTION AND THE PROPRIETY OF THE REMEDY

In *Puerto Rico Telephone* v. *Labor Relations Board,*
86 P.R.R. 362 (1962)., we re-examined the doctrine an-
nounced in *Labor Rel. Board* v. *I.L.A.*, 73 P.R.R. 568, 579–
97 (1952), in the light of the opinions delivered by the
National Supreme Court in *Guss* v. *Utah L.R.B.*, 353 U.S. 1
(1957), and *San Diego Bldg. Trades Council* v. *Garmon,*
359 U.S. 236 (1959), and reaffirmed the authority of the
Legislative Assembly of Puerto Rico, in the exercise of its
police power, to regulate the violation of a collective agree-
ment as an unfair labor practice. We pointed out, in the
face of a challenge of the jurisdiction of the State Labor
Relations Board, that the exclusiveness of the National
Board was limited, by the very terms of the act on the
matter, to the scope of the activities protected and the unfair
practices listed therein, and that, the field of violation of
collective agreements not being regulated by federal but by
local legislation, there was no conflict whatsoever of juris-
diction.[11]    We said: "In Puerto Rico, where by express
legislative declaration agreements are vested with a public
interest, *the proper forum to compel compliance with the
obligations contracted under a collective agreement is the
State Labor Relations Board, by declaring that the violation
of agreements* by the employer as well as by the employee
constitutes an unfair practice. This aspect of the perform-
ance of contracts was therefore removed from the action of
the courts, although reserving to them the field of litigation
in matter of damages for the violation thereof, inasmuch as
the latter involves a matter of purely private interest of the
contracting parties." (Italics ours.)

---

[11] We examined recently an aspect of the jurisdiction of both agencies
in *Labor Relations Board* v. *Milares Realty, Inc.*, 90 P.R.R. 821 (1964).

■ Viewed in its true focus, the controversy in the present appeal is not, nor could be, directed at challenging the exclusive jurisdiction of the Puerto Rico Labor Relations Board to take cognizance of a complaint charging as an unfair practice the violation of a collective agreement. What is more, it is not seriously questioned that the conduct observed by defendant departed from and violated the clear and express terms of the existing contract. In fact, the only question is the propriety of the remedy provided, it being argued that since the question is a provision on alleged private rights—dues deducted for the benefit of a union—such a determination is for the courts of justice. The corollary of this position seems to be the contention that the deposit of the dues extinguished the obligation arising from the collective agreement, thereby emasculating every action on the part of the Board.[12]

Once again we reiterate that the lawmaker vested the Board with exclusive jurisdiction to avoid and remedy unfair labor practices, *Luce & Co., S. en C.* v. *Labor Relations Board*, 82 P.R.R. 92, 97 (1961); *Labor Relations Board* v. *Ortega*, 79 P.R.R. 714 (1956); *Asoc. de Guardianes* v. *Bull Line*, 78 P.R.R. 680 (1955); *Labor Relations Board* v. *Simmons Int'l, Ltd.*, 78 P.R.R. 360 (1955); *Asoc. Empl. Bayamón Transit* v. *Labor Relations Board*, 70 P.R.R. 273 (1949),[13] as an effective means to promote public policy in

---

[12] It is well to recall that both the original charge of unfair practice and the act of deposit took place on the same day of October 9, 1962. The Board entered its order, which includes the pronouncement on the disposition of the dues deducted, on November 15, 1963, when no final action had been taken by the courts of justice.

[13] Section 7(a) of the Labor Relations Act, 29 L.P.R.A. § 68, provides that "The Board shall have power . . . to prevent any person from engaging in any of the unfair labor practices enumerated in section 8. This power *shall be exclusive and shall not be affected by any other method of adjustment or prevention.*"

In the federal jurisdiction, see 29 U.S.C. § 141, and *Garner* v. *Teamsters Union*, 346 U.S. 485 (1953); *Newport News Co.* v. *Schauffler*, 303

the field of labor-management relations which manifests itself predominantly in a desire to maintain industrial peace, thereby insuring the free flow of production and commerce. The performance of concerted agreements is an indispensable instrument in accomplishing the stabilization of those relations. Hence, the express declaration of our Act to the effect that they are vested with the highest public interest. There should be no question either on the State's interest to foster the organization of a strong, stable and responsible labor movement. To this end, we depend mostly on the clauses on economic benefit for the contracting union, which are included in every agreement, among which is that on deduction of dues.

The administration of this public policy was entrusted to the Board and it was empowered to enter the corresponding orders to cease and desist from conduct constituting unfair practices—prevention with prospective character—and to take such affirmative action as will effectuate the purposes of the Act—remedy for conduct contrary to the Act.[14] In the

U.S. 54 (1938); *Myers* v. *Bethlehem Corp.*, 303 U.S. 41 (1938); *Born* v. *Laube*, 213 F.2d 407 (9th Cir. 1954); *Nathanson* v. *National Labor Relations Board*, 194 F.2d 248 (1st Cir. 1952); *California Ass'n* v. *Building and Const. Tr. Council*, 178 F.2d 175 (9th Cir. 1949); *Amalgamated Ass'n, Etc.* v. *Dixie Motor Coach Corp.*, 170 F.2d 902 (8th Cir. 1948); *Amazon Cotton Mill Co.* v. *Textile Workers Union*, 167 F.2d 183 (4th Cir. 1948); 33 N.Y.U.L. Rev. 691 (1958); 43 Cornell L.Q. 308 (1958); 7 Lab. L.J. 5 (1956); 31 Temp. L.Q. 166 (1958); 102 U. Pa. L. Rev. 959 (1954); 67 Harv. L. Rev. 1297 (1954).

[14] There are obvious reasons of special importance requiring the disqualification of the judicial forum and the establishment of the primary jurisdiction of a specialized agency to take cognizance of matters involving conduct allegedly constituting an unfair practice: (a) the need for attaining uniformity in the construction and application of the Act and in the administration of the labor policy, *Puerto Rico Telephone Co.* v. *Labor Relations Board, supra*; (b) to prevent the proliferation of proceedings and the possibility of conflicting judicial decisions, *Luce & Co., S. en C.* v. *Labor Relations Board*, 82 P.R.R. 92 (1961); (c) the implied capacity of a specialized board to enforce a defined public policy, see *San Diego*

present case the power of the Board to *avert* the unfair practice—prevent the violation of an agreement—was frustrated by the celerity with which the events developed since the split between the S.I.U. and the U.T.A.M.A. early in October 1962 until the new certification in January 1963,[15] as well as the need for following the procedure provided by the Act and the regulations for presentment of charge, order of filing, hearing of the complaint, etc. The only power which the Board then had, in defense of the public interest, was its power to *remedy. Cf. Labor Relations Board* v. *Ceide*, 89 P.R.R. 659 (1963).

■ From the foregoing it may be inferred that, once the Board's exclusive jurisdiction to take cognizance of a case of violation of an agreement is recognized, the question for determination is whether the measure adopted by way of remedy is adequate and succeeds in giving effectiveness to the public policy. In *Asociación de Guardianes* v. *Bull Line*, 78 P.R.R. 680 (1915), the Asociación de Guardianes de Puerto Rico filed a complaint on declaratory judgment seeking an interpretation on the scope of a collective agreement clause relative to the powers of a grievance committee. The

---

*Building Trades Council* v. *Garmon, supra.*

In *Commonwealth* v. *12,974.78 Square Meters*, 90 P.R.R. 494 (1964), we made an ample exposition of the doctrine of primary jurisdiction and its importance in administrative law. We refer to it.

[15] Unlike the federal legislation, 29 U.S.C. § 160(j), our Act does not empower the Board to petition for temporary relief aimed at preventing the continuation of actions which prima facie constitute unfair practices. The Board has been unsuccessfully seeking this authority since 1952. See the Eighth Annual Report of the Puerto Rico Labor Relations Board, p. 63 *et seq.*, S.B. 344 introduced on April 15, 1953, and H.B. 240 introduced on March 14, 1957.

The Legislative Assembly is bound to determine whether the purpose pursued—the elimination of the commission of unfair practice subsequent to the stage in which the complaint has been issued, namely, after an administrative determination of probable cause has been made, without having to wait for the termination of a protracted proceeding—is warranted under extraordinary circumstances.

complaint having been demurred to for lack of jurisdiction on the ground that the facts alleged constituted an unfair labor practice, the investigation and jurisdiction of which came within the exclusive competence of the Board, we said in sustaining the trial court's action: ". . . this is not a proceeding in which the gist of the question is whether or not the employer committed an unfair labor practice. In the latter case, the only question involved would be a *public right* and our Labor Relations Board would have exclusive jurisdiction. [Citation.] The only question involved here is the *private rights* of the employees under the collective bargaining agreement. And, as stated in the *N.Y. & P.R. S.S. Co.* case, at pp. 791–96, particularly in footnote 4, the exclusive jurisdiction of the Board to protect the *public* right does not necessarily bar a suit in the local courts by employees to protect their *private* rights where, as here, they maintain that they were discharged without any justification. *If the Board had acted in the instant case to enforce the public right, the question would be different as to whether or not this litigation was improper because it interfered with the proceeding before the Board. However, in the absence of a proceeding pending before the Board, this private suit to enforce a private right against an alleged unjustified discharge is not different from a private suit claiming wages under a collective bargaining agreement. We do not believe it was the legislative intent to bar such private suits where, as here, the Board has taken no action in connection with the public right involved.*" (Italics ours.) We see how only in the absence of the Board's intervention may the courts intervene in disputes which, though involving private interests, are pertinent and relevant to the Board's remedial power for the protection of the public interest.[16] See, also,

---

[16] The intervention of the courts has been restricted even more as a result of the opinion delivered in *Pérez* v. *Water Resources Authority*, 87 P.R.R. 110 (1963).

*Labor Relations Board* v. *N.Y. & P.R. S.S. Co.*, 69 P.R.R. 730 (1949); *Quiñones* v. *Labor Relations Board*, 69 P.R.R. 551 (1949).

It is true that some isolated expressions may be found in federal cases which, in considering the claim of dues deducted in pursuance of collective-agreement provisions, refer to the fact that they involve the adjudication of private rights, and that, therefore, their determination is for the courts. *Roberston* v. *Eastern Air Lines*, 54 L.R.R.M. 2274; *Local 464* v. *Hershey Chocolate Corp.*, 53 L.R.R.M. 2612 (1963);[17] *Heisler* v. *Parsons*, 312 F.2d 172 (7th Cir. 1962); *Bakery & Confectionary Workers* v. *Bowman*, 48 L.R.R.M. 3112;[17] *Local 464 American Bakery, etc.* v. *Hershey Choc. Corp.*, 169 A.2d 54 (Pa. 1961);[17] *N.L.R.B.* v. *Clarke & Lewis Co.*, 274 F.2d 817 (5th Cir. 1960). However, the persuasive force of these opinions is not controlling if we consider that: (1) in the federal jurisdiction the violation of an agreement does not constitute an unfair labor practice; (2) the situations have arisen on the occasion of the disaffiliation of local unions from national or international unions; (3) the purpose is to protect the local unions which have disaffiliated from organizations controlled by undesirable individuals of the underworld or by communists; (4) the federal act provides the discertification procedure in the event of genuine schisms within the union membership, 29 U.S.C. § 159 (e), and expressly provides that no election shall be directed until after one year following the certification of the union representing the workers, 29 U.S.C. § 159 (3). See *Disposition of Union Assets Upon Disaffiliation*, 33 Temp. L.Q. 152 (1960); *The Effect of a Change of Bargaining Representative*, 10 Lab. L.J. 845 (1959). None of these

---

[17] The fact that the dues should benefit the employees who pay them is considered a determining factor in these cases, a criterion which is probably more adequate in the case of property acquired through the investment of union funds.

circumstances concur in the present case. *Glove Workers Union* v. *Wisconsin Board*, 45 L.R.R.M. 2731 (1960), considered a similar situation under the Labor Relations Act of that state defining the violation of an agreement as an unfair practice. The following language at p. 2736 is most significant: "It is considered, in view of the broad purpose of the Employment Relations Law to clothe the Wisconsin Labor Relations Board with power to interpret collective bargaining agreements in its adjudication of disputes as to 'unfair labor practices,' including particularly alleged violations of 'the terms of a collective bargaining agreement' . . . that the Board had the power and the duty in this case, upon dismissal of the complaints, to enter *an order directing disposition of the check-off funds in the hands of the employer.*" (Italics ours.)

■ Considering all the circumstances of the present case, we hold that the Board's order on the disposition of the checkoff dues is proper as a remedy incidental to an unlawful practice proceeding. Perhaps it is the only way of revendicating the public interest involved in the dispute. Any other solution would be an invitation to the employer, upon the slightest sign of germination or existence of a dispute, real or apparent, in the union membership, and notwithstanding the certification of the incumbent organization as exclusive agent of the workers, to deposit the checkoffs thereby depriving the recognized unions of an effective administration of any existing agreement, attempting against the very life of the latter, and encouraging dissension in serious detriment to the stability in the labor movement. This situation is much more critical in Puerto Rico where experience shows that the labor movement is unstable, and that very frequently its energies are devoted more to the internal struggles than to spreading the advantages of unionization.

An examination of the record convinces us that the order to deliver the dues to the S.I.U. is reasonable considering

that, irrespective of the fact that it unquestionably lost a great majority of the membership as shown by the result of the election, it continued to administer the agreement as the circumstances permitted. There is no reason whatever for depriving it of these funds. We also agree that the effects of the disposition should extend to the date of certification of the U.T.A.M.A. as the exclusive representative of the workers, since, as stated in the Board's brief, the fact of the desertion does not entail the loss of the representative character of the incumbent union before the employer. Furthermore, there is danger that a different solution may impair the efficacy of a certification and constitute an invitation to the workers to change representatives frequently, thereby eluding their obligations with the union. We expressly wish to make clear that nothing herein stated constitutes a solution in the event of disposition of property, especially real property, acquired by the union with the workers' funds.

We agree that this is not a proper case for the imposition of costs, *Labor Relations Board* v. *Morales*, 89 P.R.R. 760 (1964); *Reserve Supply Corp.* v. *N.L.R.B.*, 317 F.2d 785 (2d Cir. 1963), 53 L.R.R.M. 2374, 2377.

The conclusion which we have reached also relieves us from discussing whether the U.T.A.M.A. could intervene in the present proceeding, even though as a matter of fact such opportunity was given to it before the Board, of which it did not avail itself, and before this Court.

Lastly, this appeal shows the pressing need for a review of the labor relations legislation in order to conform it to the realities which have arisen in the course of the development of the labor movement and the country's economy. The Board has efficiently discharged its mission, but many of its solutions have to be the product of improvisation. Such a situation is not desirable for an agency charged with the administration of a public policy and much less for the

laborers and the employers. All have the right to expect certainty and security on the extent of their respective rights and powers. The contrary would be to perpetuate a state of trial and error in the Board's remedies and orders. The Legislative Assembly is the one called upon to take proper action to face the situation.

Judgment will be rendered enforcing the order of the Labor Relations Board and providing for the cessation of our order staying the proceedings before the Superior Court to which we have made reference in the course of this opinion.