JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, peticionaria, *v.* AUTORIDAD METROPOLITANA DE AUTOBUSES, demandada; SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, ETC., UNIÓN DE TRABAJADORES AUTORIDAD METROPOLITANA DE AUTOBUSES, interventores.

*Número:* JRT-64-2     *Resuelto:* 4 de diciembre de 1964

*J. B. Fernández Badillo*, Procurador General, *José Orlando Grau*, y *Luis M. Rivera Pérez*, abogados de la peticionaria; *José Raúl Cancio*, abogado de la demandada; *Sarah Torres Peralta*, y *Ginoris Vizcarra*, abogadas de la S.I.U.; *Nicolás Nogueras, Jr.*, abogado de la U.T.A.M.A.

Sala integrada por el Juez Asociado Señor Blanco Lugo como Presidente Accidental de Sala y los Jueces Asociados Señores Dávila y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

La Junta de Relaciones del Trabajo de Puerto Rico nos ha solicitado que pongamos en vigor una orden dictada por dicho organismo dirigida a la Autoridad Metropolitana de Autobuses que requiere de ésta:

"Tomar la siguiente acción afirmativa que efectúa los propósitos de la Ley de Relaciones del Trabajo de Puerto Rico:

"(a) Entregar a la Seafarers International Union (Puerto Rico Division) el importe de las cuotas descontadas a los empleados de operación y mantenimiento de la querellada, desde la semana comenzada el 26 de septiembre de 1962 hasta la semana terminada el 1 de enero de 1963.

"b) Notificar al Presidente de la Junta de Relaciones del Trabajo de Puerto Rico dentro de los diez (10) días siguientes a la fecha de la Orden, qué providencias ha tomado para cumplir lo ordenado."

La demandada contestó. Expuso que en todo momento ha estado en disposición de cumplir, de buena fe, [1] con los términos de la orden transcrita, y que, con motivo de la reclamación de las cuotas descontadas por dos organizaciones obre-

---

[1] Para sostener tal aserto cita el párr. 4 de la petición de la Junta que lee: "Hasta la fecha se ha hecho imposible el cumplimiento de la Orden antes transcrita porque la Unión de Trabajadores de la Autoridad Metropolitana de Autobuses reclama las cuotas aludidas anteriormente y ha iniciado diversas acciones legales para evitar que la Demandada cumpla la Orden expedida por la Peticionaria."

ras distintas—la Seafarers International Union y la Unión de Trabajadores de la Autoridad Metropolitana de Autobuses —"ante el justificado temor de tener que pagar dos veces" había optado por consignar su importe en la secretaría del Tribunal Superior, Sala de San Juan, con el evidente propósito de que la autoridad judicial determine en definitiva a cuál de las dos entidades corresponde la suma así consignada. [2] Adujo todas estas razones para explicar su incumplimiento y terminó allanándose a que se dictara el decreto correspondiente poniendo en vigor en su totalidad la orden de la Junta, siempre que se le protegiera de la posibilidad de tener que satisfacer doblemente las cuotas descontadas.

En vista de que la acción solicitada indudablemente afectaba a la Seafarers International Union of North America (Puerto Rico Division) y la Unión de Trabajadores de la Autoridad Metropolitana de Autobuses, les concedimos término para alegar lo que a su derecho conviniere. Así lo hicieron ambas.

La S.I.U. solicitó se pusiera en vigor la orden y además que se modificara para incluir un pronunciamiento sobre el

[2] Con motivo de las distintas reclamaciones sobre el importe de las cuotas descontadas se presentaron ante el Tribunal Superior, Sala de San Juan, varios pleitos que, a petición de la Junta y como un incidente para proteger nuestra jurisdicción en el presente recurso, paralizamos mediante resolución de 8 de abril de 1964, a saber: 1—Civil 62-7685, Autoridad Metropolitana de Autobuses, ex parte, sobre Consignación; 2—Civil 63-201, Seafarers International Union v. Autoridad Metropolitana de Autobuses, sobre Cobro de Dinero; 3—Civil 64-40, Unión de Trabajadores de la Autoridad Metropolitana de Autobuses, sobre Sentencia Declaratoria; y, 4—Civil 64-209, Seafarers International Union, etc. v. Autoridad Metropolitana de Autobuses, sobre Daños y Perjuicios. En los dos primeros pleitos, que fueron consolidados a los fines de su disposición, recayó sentencia en 27 de noviembre de 1963 por la cual se decretó su archivo y sobreseimiento por haber la Junta de Relaciones del Trabajo asumido jurisdicción sobre la materia "en el ejercicio de su facultad exclusiva, según la misma aparece consagrada en el Art. 7 de la Ley de Relaciones del Trabajo de Puerto Rico." En 16 de diciembre se declaró sin lugar una solicitud de reconsideración. Por idénticos fundamentos se declaró con lugar en 31 de marzo de 1964 una moción para desestimar la demanda en el caso Civil 64-40.

pago de intereses "en virtud de la violación de sus derechos de que fue víctima por parte de la querellada." (³)

La U.T.A.M.A. alegó que a) la solicitud de la Junta era improcedente ya que la determinación sobre la entidad a la cual correspondían las cuotas descontadas constituía una materia que requería la adjudicación de derechos privados y no derechos públicos, careciendo por ende el mencionado organismo de jurisdicción; b) la decisión y orden afecta a más de mil trabajadores de la querellada y a la unión que actualmente les representa, sin que fueran partes en el procedimiento sobre práctica ilícita ante la Junta; c) la consignación por la querellada de las cantidades descontadas le releva de ulterior obligación y traslada la dilucidación de la controversia ante los tribunales ordinarios de justicia, como foro apropiado para tal fin; y d) en todo caso, lo procedente es ordenar la entrega de los fondos a la unión que representa a los trabajadores en la actualidad.

Hasta aquí la controversia tal cual se plantea en las alegaciones. Para una mejor comprensión de todas las cuestiones envueltas es preciso resumir, aunque sea a grandes rasgos, la turbulencia y rápidos cambios que han caracterizado las relaciones obrero-patronales en la Autoridad Metropolitana de Autobuses.

---

(³) La Seafarers había presentado ante nos un recurso que se registró bajo el Núm. JRT-64-1 para lograr el cumplimiento de la orden de la Junta. Dentro de este procedimiento no solicitó la modificación para que se incluyeran intereses. Desestimamos su solicitud al tomar conocimiento del presente recurso.

En el informe de la oficial examinadora de fecha 29 de octubre de 1963 expresamente se recomendó que no se impusiera el pago de intereses, considerando que 1) era ésta la primera ocasión en que se planteaba un cargo de esta naturaleza fundado en los hechos ya relatados; 2) la unión querellante era una organización de reconocida solvencia, lo que le permitió continuar cumpliendo sus obligaciones como representante de los obreros.

504

## —I—

## *LOS HECHOS Y EL CARGO DE PRACTICA ILICITA* (⁴)

### A—Los Hechos

A partir del año 1949 la Autoridad Metropolitana de Autobuses ha negociado colectivamente con la organización obrera certificada por la Junta de Relaciones del Trabajo como la representante de la mayoría de sus empleados en la unidad apropiada para la contratación. Originalmente la organización obrera era la Unión de Choferes y Mecánicos Núm. 1 de San Juan y Ramas Anexas, Inc., que luego varió su nombre por el de Unión de Trabajadores del Transporte de Puerto Rico, IBL-AFL-CIO. Facultada por la certificación, en junio de 1959, esta unión negoció un convenio con la empresa que expiraba en 31 de diciembre de 1962, y cuyo Art. VII sobre descuento de cuotas (⁵) disponía así:

"La Autoridad conviene en descontar del sueldo o salario que devengan los empleados cubiertos por la unidad contratante las cuotas mensuales acordadas en asamblea de la Unión debidamente constituída. El Secretario-Tesorero de la Unión, con el visto bueno del Presidente, enviará certificación de dicho acuerdo a la Autoridad para la acción correspondiente. La cantidad de dinero así descontada será entregada al Secretario-Tesorero de la Unión mensualmente con una copia de la nómina o una lista del personal a quienes se le ha hecho el descuento."

---

(⁴) Para este resumen de los hechos dependemos de las constancias en los procedimientos ante la Junta en el caso CA 2765, dentro del cual se ofrecieron en evidencia los expedientes que dieron lugar a las decisiones 273 y 304 de la Junta.

(⁵) Para la fecha en que se firmó este convenio la Sec. 5 de la Ley Núm. 17 de 17 de abril de 1931, 29 L.P.R.A. sec. 175, permitía al patrono la deducción del salario del obrero de las cuotas para una unión estipuladas en un convenio colectivo de trabajo, y requería la prestación de fianza por el tesorero u oficial designado para recibir tales cuotas. Las leyes enmendatorias conservan sustancialmente la misma redacción. Dentro de la ordenación de la sección el descuento autorizado de cuotas figura ahora como el inciso (d), 29 L.P.R.A. (Supl. 1963, pág. 132), sec. 175. Véase, además, el Art. 8(1)(b) de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 69.

En marzo de 1962 un nutrido grupo de empleados incluidos en la unidad de contratación constituyeron un núcleo de oposición a la unión certificada y gestionaron la ayuda de la Seafarers International Union (Puerto Rico Division) para que presentara la correspondiente solicitud para la investigación y certificación de representante. Propiamente no existió una afiliación entre el grupo de obreros y dicha unión internacional, pero sus relaciones se caracterizaban por ciertas condiciones peculiares que, en efecto, equivalían al reconocimiento de la autonomía de la entidad local para bregar con sus problemas, especialmente en cuanto a la negociación de convenios.[6] En 21 de mayo de 1962 la Junta decretó la celebración de elecciones, que tuvieron lugar el 6 de junio. El núcleo "disidente" que venía combatiendo desde hacía tiempo a la directiva de la U.T.T., y que concurrió a las elecciones como Seafarers International Union, obtuvo la mayoría. En consecuencia, la Junta certificó en 13 de junio a la S.I.U. como la unidad apropiada y representante exclusiva de los trabajadores. Justo es reconocer que la ayuda moral y

---

[6] En 17 de mayo de 1962, los señores Keith Terpe y Felipe de Jesús, Presidente y Secretario Ejecutivo respectivamente de la S.I.U., declararon bajo juramento:

"1. Que la Seafarers International Union División de Puerto Rico, *respaldará la autonomía* de la Unión del Transporte de Puerto Rico. Los trabajadores de la A.M.A. tendrán su propio 'charter' elegirán su propio cuerpo directivo, negociarán sus propios convenios colectivos y administrarán y dirigirán su Unión libremente.

"2. Que la Seafarers International Union División de Puerto Rico reconoce y reconocerá el derecho que tienen los trabajadores de la A.M.A. de administrar y conservar sus propiedades. Estas propiedades serán *propiedad exclusiva* de los trabajadores de la A.M.A. y la Seafarers International Union División de Puerto Rico no puede intervenir ni intervendrá en el manejo y uso que los trabajadores de la A.M.A. quieran darle a sus propiedades. Esto es un derecho de los trabajadores de la A.M.A. y nosotros *RESPETAREMOS* ese derecho.

"3. Que la Seafarers International Union División de Puerto Rico dará todo su apoyo moral, económico, legal y físico a los trabajadores de la A.M.A. y declaramos que la Seafarers International Union División de Puerto Rico se mantendrá respaldando a los trabajadores de la A.M.A. en su lucha en contra de la tiranía y la dictadura que existe en su Unión y se mantendrá firme al lado de los trabajadores."

económica prestada por la S.I.U. al grupo local práctica-
mente aseguró en las elecciones celebradas.

En 19 y 20 de junio los trabajadores celebraron una
reunión en la cual designaron su junta directiva, los delega-
dos para la tramitación de quejas y agravios y para el fondo
de bienestar, y se adoptaron otras medidas conducentes a la
administración del convenio colectivo existente. [7] No hay
duda de que tanto la unión certificada como el patrono acep-
taron tácitamente que las relaciones entre ambos continuaran
rigiéndose por el contrato que expiraría el 31 de diciembre,
tal vez por la proximidad de la expiración del término de
vigencia.

Apenas habían transcurrido tres meses de la certifica-
ción, cuando para fines de septiembre de 1962 comenzó a
manifestarse cierto desasosiego entre los trabajadores debido
a la incertidumbre que reinaba respecto a la relación especial
que existía entre el grupo local y la S.I.U. Impacientados por
no haberse materializado en forma más tangible la promesa
de autonomía, los directores visitaron al señor Terpe para
inquirir sobre la negociación del próximo convenio y la esta-
bilización—mediante una simple afiliación—de la organiza-
ción local con la internacional. Aparentemente la vaguedad
de las manifestaciones del señor Terpe en esta entrevista,
unida a su exagerada insistencia en que la certificación había
sido expedida directamente a la S.I.U., creó cierto temor en
los directores que les convenció de la necesidad de reunir la
matrícula para considerar la situación. Entre otras cosas,
el mismo día de la entrevista, los directores dirigieron una
comunicación a la empresa requiriéndole la iniciación de las
conversaciones para la discusión del nuevo convenio. Fue sus-

---

[7] Conveniente es consignar que en 11 de julio, la S.I.U. dirigió una
comunicación a la empresa indicándole que el Secretario-Tesorero recién
electo no prestaría fianza alguna debido a que los obreros estaban afiliados
directamente a dicha unión, y, los fondos provenientes de cuotas no estaban
bajo la custodia inmediata de dicho oficial, sino que ingresaban a la S.I.U.

crita, "Unión de Trabajadores de la A.M.A., afiliada a la S.I.U."

Las relaciones entre el grupo y la S.I.U. se deterioraron rápidamente. Durante los días 2 y 3 de octubre se celebró una asamblea a la cual asistieron 470 trabajadores. Las decisiones tomadas revelan que se consumó el rompimiento total y definitivo entre el grupo y la S.I.U. Se constituyó la Unión de Trabajadores de la Autoridad Metropolitana de Autobuses y se acordó: (a) solicitar de la A.M.A. que descontinuara el descuento de cuotas a los obreros para ser entregadas a la S.I.U., (b) retirar la autorización a la S.I.U. para intervenir en la negociación del nuevo convenio; (c) fijar una cuota para los gastos del grupo local; y, (d) sustituir al Secretario Tesorero, que había continuado fiel a la S.I.U., por el señor Ismael Vargas. Todos estos acuerdos se notificaron al patrono el día 4 de octubre.

Ante esta situación en 9 de octubre A.M.A. retuvo las cuotas descontadas y comenzó a consignarlas en la Secretaría del Tribunal Superior.

En 10 de octubre la U.T.A.M.A. radicó una solicitud de certificación ante la Junta de Relaciones del Trabajo. El 11 de diciembre este organismo ordenó la celebración de las elecciones, (8) y celebradas el día 27, la U.T.A.M.A. obtuvo un respaldo absoluto según lo evidencia el resultado de la votación, 863 a 6. En 2 de enero de 1963, la Junta certificó a la U.T.A.M.A. como representante exclusiva de los trabajadores a los fines de la negociación colectiva, reconocimiento que subsiste hasta esta fecha.

Mientras tanto, ¿qué ocurrió en la administración del convenio durante el período comprendido entre el 9 de octubre y el 31 de diciembre de 1962? Veamos. 1—El 17 de octubre, la S.I.U. sustituyó los delegados en los diversos talleres de

---

(8) La S.I.U. solicitó ante este Tribunal la revisión de la orden de elecciones, y en 21 de diciembre nos negamos a expedir el auto. El Tribunal Supremo federal denegó una petición de *certiorari* para revisar nuestra resolución, 372 U.S. 914 (1963).

la empresa mediante comunicación que le dirigió en la cual le indicó además que tanto estos delegados como los representantes en el Comité de Quejas y Agravios serían los que designara la S.I.U. El patrono, en contestación a esta comunicación, tomó nota de las designaciones, y expresó que *"No creo haya problema alguno en cuanto a la administración del presente convenio. La S.I.U.* es hasta el presente la Unión certificada como la representante de los trabajadores comprendidos en la unidad apropiada. La situación es distinta en lo referente a su petición para negociar un nuevo convenio colectivo. Habiéndose radicado una petición para investigar y determinar una controversia de representación . . . no podemos iniciar negociaciones sobre convenio colectivo." 2—Hasta el día 29 de octubre el patrono se reunió con los representantes designados por la S.I.U. para ventilar las quejas y agravios, pero en esa fecha, los empleados de talleres llevaron a cabo un paro de protesta para significar su desaprobación sobre la forma en que estaba constituido dicho comité. Por tal motivo, el Gerente General de la A.M.A. se dirigió al señor Terpe notificándole que "bajo las circunstancias prevalecientes no volveré a reunirme con sus representantes ni volveré a reunir comité alguno para la administración del presente convenio colectivo, hasta tanto usted no ofrezca garantías de que la Unión que usted preside, tiene control efectivo sobre los empleados . . . ." 3—La empresa continuó enviando comunicaciones a la S.I.U. conforme a las cláusulas del convenio. 4—Desde el 29 de octubre no se autorizaron erogaciones con cargo al Fondo de Bienestar, pero sus síndicos—incluyendo los representantes designados por la S.I.U.—continuaron reuniéndose para administrarlo. En esta actividad no participó la U.T.A.M.A. Puede asegurarse que durante este período la U.T.A.M.A. no intervino en forma alguna en la administración del convenio existente.

B—El Cargo de Práctica Ilícita

En 9 de octubre de 1962, la Seafarers International Union radicó un cargo contra la Autoridad Metropolitana de Autobuses imputándole prácticas ilícitas de trabajo dentro del significado de los incisos (a), (b), (d) y (f) de la Sec. 1 del Art. 8 de la Ley. (⁹) El cargo fue enmendado dos semanas después, y en el mismo se alegaba que dicha empresa había incurrido en conducta reñida con el estatuto al a) consignar las cuotas descontadas a los obreros, y negarse a entregarlas a la unión certificada, en violación de los términos del convenio colectivo vigente; b) ayudar indebidamente a la U.T.A.M.A., que era una "unión rival"; c) rehusar negociar colectivamente con la unión querellante; y, d) negociar con una organización obrera que no había sido certificada.

En 25 de abril de 1963, luego de celebradas las elecciones en las cuales triunfó la U.T.A.M.A. y como consecuencia se le certificó como representante exclusiva a los fines de la negociación colectiva, el Presidente de la Junta expidió un aviso de audiencia y de desestimación de cargos haciendo constar que no expediría querella alguna con respecto a las alegaciones formuladas en los apartados (b), (c) y (d) anteriores, y convocando a una audiencia a la A.M.A. y a la U.T.A.M.A. para mostrar causas por las cuales no debía ordenarse que abogados de la Junta comparecieran ante el

---

(⁹)Dichos incisos, 29 L.P.R.A. sec. 69, en lo pertinente, leen como sigue:

"(a) Intervenga, restrinja, ejerza coerción o intente intervenir, restringir o ejercer coerción con sus empleados en el ejercicio de los derechos garantizados por la sec. 65 de este título.

"(b) Inicie, constituya, establezca, domine, intervenga o intente iniciar, constituir, establecer, dominar o intervenir con la formación o administración de cualquier organización obrera, o contribuya a la misma con ayuda económica o de otra clase . . . .

"(c) . . .

"(d) Rehuse negociar colectivamente con el representante de una mayoría de sus empleados en una unidad apropiada de negociación colectiva . . . .

"(f) Viole los términos de un convenio colectivo . . .".

Tribunal Superior, Sala de San Juan, a solicitar que los fondos consignados fueran entregados a la S.I.U.(10) En 6 de agosto el Lic. Miguel Velázquez Rivera, quien había actuado como oficial examinador, presentó un informe en el cual concluyó que la S.I.U. tenía derecho a que se le reconociera la facultad de recibir y utilizar el importe de las cuotas descontadas desde la fecha en que comenzó la consignación hasta que se certificó a la U.T.A.M.A. como representante exclusiva de los trabajadores en la unidad apropiada.

El día 27 de septiembre, el Presidente de la Junta ordenó a la División Legal del organismo que expidiera la correspondiente querella a base del cargo sobre violación de convenio. En la misma fecha se cumplimentó tal orden. La audiencia se celebró el 16 de octubre. Del informe de la oficial examinadora aparece que "el Lic. Nicolás Nogueras, abogado de la Unión de Trabajadores de la Autoridad Metropolitana de Autobuses, no compareció aunque fue notificado debidamente de este procedimiento y al comienzo del mismo se gestionó infructuosamente localizarlo en sus oficinas." A la decisión y orden de la Junta nos hemos referido al comienzo de esta opinión. Para explicar su actuación dice en parte: "En el pasado hemos considerado que en los casos en que se reclama el cumplimiento de obligaciones originadas en un convenio colectivo, la mejor regla es la de exigir el cumplimiento del convenio con la Unión incumbente hasta que ésta sea sustituida por otra . . . . Así hacemos claro para patronos y organizaciones obreras el principio cardinal de nuestra Ley de que los convenios colectivos son para cumplirse al pie de la letra, y además aclaramos a los empleados que cuando designan un representante colectivo están obligados a contribuir a su sostenimiento."

(10) En 21 de noviembre de 1963 la Junta compareció en los pleitos consolidados a que nos hemos referido en el escolio 2 y, acompañando copia de su decisión y orden, solicitó la desestimación por falta de jurisdicción.

También compareció en 16 de enero de 1964 en el pleito sobre sentencia declaratoria haciendo igual planteamiento.

—II—

## LA CUESTION JURISDICCIONAL Y LA PROPIEDAD DEL REMEDIO

En *P.R. Telephone* v. *Junta Rel. del Trabajo*, 86 D.P.R. 382 (1962), reexaminamos la doctrina que habíamos enunciado en *Junta Rel. del Trabajo* v. *I.L.A.*, 73 D.P.R. 616, 628-645 (1952), a la luz de las opiniones emitidas por el Tribunal Supremo federal en *Guss* v. *Utah L.R.B.*, 353 U.S. 1 (1957) y *San Diego Bldg. Trades Council* v. *Garmon*, 359 U.S. 236 (1959), y reafirmamos la facultad de la Asamblea Legislativa de Puerto Rico para, en el ejercicio de su poder de razón de estado, reglamentar la violación de un convenio colectivo como una práctica ilícita de trabajo. Señalamos, frente a una impugnación de la jurisdicción de la Junta Estatal de Relaciones del Trabajo, que la exclusividad de la Junta federal estaba limitada, por los propios términos de la ley sobre la materia, al ámbito demarcado por las actividades protegidas y las prácticas ilícitas enumeradas en la misma, y que no estando el campo de violación de convenios colectivos reglamentado por legislación federal, y sí por la local, no surgía conflicto jurisdiccional alguno.[11] Dijimos: "En Puerto Rico, donde por declaración expresa legislativa los convenios están revestidos de interés público, *el foro adecuado para obtener el cumplimiento de las obligaciones contraídas en virtud de un convenio colectivo es la Junta Estatal de Relaciones del Trabajo, a través de la declaración como práctica ilícita de la violación de convenios*, tanto por el patrono como por el empleado. Se sustrajo, pues, de la acción de los tribunales este aspecto del cumplimiento de convenios, reservándoseles, por supuesto, el campo de la litigación en materia de daños por el quebrantamiento de los mismos, por tratarse en este último caso de un asunto de puro interés privado de los contratantes." (Énfasis suplido.)

[11] Recientemente examinamos un aspecto de la jurisdicción de ambos organismos en *J.R.T.* v. *Milares Realty, Inc.*, 90 D.P.R. 844 (1964).

■ Colocada en su verdadero foco, la controversia en el presente recurso, no se dirige, ni podría dirigirse, a impugnar la jurisdicción exclusiva de la Junta de Relaciones del Trabajo de Puerto Rico, para entender en una querella que imputa como práctica ilícita la violación de un convenio colectivo. Es más, no se discute seriamente que la conducta observada por la parte querellada se apartó y quebrantó los términos claros y expresos del contrato existente. En realidad todo cuanto se cuestiona es la propiedad del remedio acordado, arguyéndose que por tratarse de una disposición sobre supuestos derechos privados—cuotas descontadas para beneficio de una unión—corresponde tal determinación a los tribunales de justicia. Corolario de esta posición parece ser la contención de que la consignación de las cuotas extinguió la obligación emanada del convenio colectivo, emasculándose en esa forma toda acción por parte de la Junta. [12]

Reiteramos una vez más que el legislador confirió a la Junta jurisdicción exclusiva para prevenir y remediar prácticas ilícitas del trabajo, *Luce & Co. S. en C.* v. *Junta Relaciones del Trabajo*, 82 D.P.R. 96, 101 (1961); *Junta Relaciones del Trabajo* v. *Ortega*, 79 D.P.R. 760 (1956); *Asoc. de Guardianes* v. *Bull Line*, 78 D.P.R. 714 (1955); *Junta Rel. Trabajo* v. *Simmons Int'l, Ltd.*, 78 D.P.R. 375 (1955); *Asoc. Empl. Bayamón Transit* v. *Junta Rel. Trabajo*, 70 D.P.R. 292 (1949), [13] como el medio efectivo para promover

---

[12] Conviene recordar que tanto el cargo original de práctica ilícita como el acto de la consignación tuvieron lugar el mismo día 9 de octubre de 1962. La Junta emitió su orden, que incluye el pronunciamiento sobre disposición de las cuotas descontadas en 15 de noviembre de 1963, cuando aún no se había tomado acción final alguna por los tribunales de justicia.

[13] El Art. 7(a) de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 68, dispone que "La Junta tendrá facultad . . . para evitar que cualquier persona se dedique a cualesquiera de las prácticas ilícitas de trabajo que se enumeran en el artículo 8. Esta facultad *será exclusiva y no la afectará ningún otro medio de ajuste o prevención.*"

En la jurisdicción federal, véanse, 29 U.S.C. sec. 141, y *Garner* v. *Teamsters Union*, 346 U.S. 485 (1953); *Newport News Co.* v. *Schauffler*, 303 U.S. 54 (1938); *Myers* v. *Bethlehem Corp.*, 303 U.S. 41 (1938); *Born*

la política pública en el campo de las relaciones obrero-patronales, que se manifiesta predominantemente en el deseo de mantener la paz industrial asegurando así el libre curso de la producción y el comercio. Instrumento indispensable para el logro de la estabilización de dichas relaciones es el cumplimiento de los convenios concertados. De ahí la declaración expresa de nuestra ley al efecto de que están investidos del más alto interés público. Tampoco debe haber duda del interés del Estado en fomentar la organización de un movimiento obrero fuerte, estable y responsable. Para esto se depende en gran parte de las cláusulas de beneficio económico para la unión contratante que se incluyen en todo convenio, entre las cuales se encuentra la del descuento de cuotas.

La administración de esta política pública se encomendó a la Junta y se le facultó para expedir las correspondientes órdenes para cesar y desistir de conducta constitutiva de prácticas ilícitas—prevención con carácter prospectivo— y tomar tal acción afirmativa que permita efectuar los propósitos de la ley—remedio para la conducta contraria a la ley. [14]

---

v. *Laube*, 213 F.2d 407 (9th Cir. 1954); *Nathanson* v. *National Labor Relations Board*, 194 F.2d 248 (1st Cir. 1952); *California Ass'n* v. *Building and Const. Tr. Council*, 178 F.2d 175 (9th Cir. 1949); *Amalgamated Ass'n, Etc.* v. *Dixie Motor Coach Corp.*, 170 F.2d 902 (8th Cir. 1948); *Amazon Cotton Mill Co.* v. *Textile Workers Union*, 167 F.2d 183 (4th Cir. 1948); 33 N.Y.U.L. Rev. 691 (1958); 43 Cornell L.Q. 308 (1958); 7 Lab. L.J. 5 (1956); 31 Temp. L.Q. 166 (1958); 102 U. Pa. L. Rev. 959 (1954); 67 Harv. L. Rev. 1297 (1954).

[14] Existen razones obvias de especial importancia que requieren la inhibición del foro judicial y el establecimiento de la jurisdicción primaria de un organismo especializado para entender en asuntos que envuelven conducta que alegadamente constituye una práctica ilícita: a) la necesidad de lograr uniformidad en la interpretación y aplicación de la ley y en la administración de la política laboral, *P.R. Telephone* v. *Junta Rel. del Trabajo*, supra; b) el evitar la proliferación de procedimientos y la posibilidad de decisiones judiciales conflictivas, *Luce & Co. S. en C.* v. *Junta Relaciones del Trabajo*, 82 D.P.R. 96 (1961); c) la capacidad que supone una junta especializada para poner en vigor una política pública definida, véase, *San Diego Bldg. Trades Council* v. *Garmon*, supra.

En *E.L.A.* v. *12,974.28 Metros Cuadrados*, 90 D.P.R. 506 (1964), se hizo una amplia exposición de la doctrina de jurisdicción primaria y su importancia en el Derecho administrativo. A ella remitimos.

514

En el presente caso la facultad de la Junta para *prevenir* la práctica ilícita—impedir la violación de convenio—fue frustrada por la celeridad misma con que se desarrollaron los acontecimientos desde la ruptura entre la S.I.U. y la U.T.A. M.A. a principios de octubre de 1962 hasta la nueva certificación en enero de 1963, (15) así como la necesidad de seguir el procedimiento que marcan la propia ley y el reglamento para la presentación del cargo, orden de radicación y ventilación de querella, etc. Solamente restaba a la Junta, en defensa de los intereses públicos, su facultad para *remediar*. Cf. *J.R.T.* v. *Ceide*, 89 D.P.R. 674 (1963).

■ De todo lo expuesto se deduce que, una vez reconocida la jurisdicción exclusiva de la Junta para entender en un caso de violación de convenio, lo que resta es determinar si la medida adoptada por vía de remedio es adecuada y logra darle efectividad a la política pública. En *Asoc. de Guardianes* v. *Bull Line*, 78 D.P.R. 714 (1915) se trataba de una demanda sobre sentencia declaratoria interpuesta por la Asociación de Guardianes de Puerto Rico para que se interpretara el alcance de una cláusula de un convenio colectivo relativa a las facultades de un comité de quejas y agravios. Excepcionada la demanda por falta de jurisdicción fundada en que los hechos que se alegaban constituían una práctica ilícita de trabajo cuya investigación y jurisdicción era de la

(15) A diferencia de la legislación federal, 29 U.S.C. sec. 160(j), nuestra ley no faculta a la Junta para solicitar órdenes provisionales encaminadas a prohibir la continuación de actuaciones que *prima facie* constituyan prácticas ilícitas. La Junta viene gestionando infructuosamente esta autoridad desde 1952. Véanse, el *Octavo Informe Anual de la Junta de Relaciones del Trabajo de Puerto Rico*, págs. 63 y ss., el P. del S. 344 presentado en 15 de abril de 1953 y el P. de la C. 240 presentado en 14 de marzo de 1957.

Corresponde a la Asamblea Legislativa determinar si el propósito que se persigue—la eliminación de la comisión de la práctica ilícita con posterioridad a la etapa en que se ha expedido querella, o sea, cuando ya se ha hecho una determinación administrativa de causa probable, sin necesidad de esperar a la terminación de un prolongado procedimiento— se justifica en circunstancias extraordinarias.

exclusiva competencia de la Junta, dijimos, al sostener la actuación del tribunal de instancia: ". . . el presente no es un recurso en el cual la única controversia gira en torno de si el patrono ha incurrido o no en una práctica ilícita de trabajo. De tratarse de este último caso solamente estaría envuelto un *derecho público* y nuestra Junta de Relaciones del Trabajo tendría jurisdicción exclusiva (cita). La única cuestión aquí envuelta son los *derechos privados* de los empleados bajo el convenio colectivo. Y, según indicamos en el caso de la *N.Y. & P.R. S/S Co.*, a las págs. 791–96, especialmente en el escolio 4, la jurisdicción exclusiva de la Junta para proteger el derecho *público* no impide necesariamente que los empleados inicien pleitos en los tribunales con el fin de proteger sus intereses privados cuando, como aquí ocurre, ellos sostienen que fueron despedidos sin justificación alguna. *Si la Junta hubiera actuado en este caso para hacer cumplir el derecho público, nos hallaríamos ante una cuestión distinta respecto a si el presente litigio era improcedente por intervenir con el procedimiento que estaba ante la Junta. Mas en ausencia de un procedimiento pendiente ante la Junta, este pleito privado para hacer cumplir un derecho privado* contra un supuesto despido injustificado no resulta distinto de un pleito privado en reclamación de salarios bajo un convenio colectivo. No creemos que la Asamblea Legislativa tuvo el propósito de impedir tales pleitos privados *cuando como en el presente la Junta no ha tomado acción alguna en conexión con el derecho público envuelto* (citas)." (Énfasis suplido.) Vemos como sólo en ausencia de intervención de la Junta es que los tribunales pueden intervenir en controversias que, aunque se refieran a intereses privados, tengan tangencia y pertinencia con la facultad remedial de la Junta en protección del interés público.[16] Véanse además, *Junta Relaciones*

---

[16] La intervención de los tribunales se ha restringido aún más en virtud de la opinión emitida en *Pérez* v. *Autoridad Fuentes Fluviales*, 87 D.P.R. 118 (1963).

*del Trabajo* v. *N.Y. & P.R. S/S Co.*, 69 D.P.R. 782 (1949); *Quiñones* v. *Junta Relaciones del Trabajo*, 69 D.P.R. 593 (1949).

Es cierto que pueden encontrarse algunas expresiones aisladas en casos federales que al considerar la reclamación sobre cuotas descontadas a tenor con disposiciones de convenios colectivos se refieren a que ello envuelve la adjudicación de derechos privados, y que, por tanto, corresponde a los tribunales su dilucidación, *Robertson* v. *Eastern Air Lines*, 54 L.R.R.M. 2274; *Local 464* v. *Hershey Chocolate Corp.*, 53 L.R.R.M. 2612 (1963); ([17]) *Heisler* v. *Parsons*, 312 F.2d 172 (7th Cir. 1962); *Bakery & Confectionary Workers* v. *Bowman*, 48 L.R.R.M. 3112; ([17]) *Local 464 American Bakery, etc.* v. *Hershey Choc. Corp.*, 169 A.2d 54 (Pa. 1961); ([17]) *N.L.R.B.* v. *Clark & Lewis Co.*, 274 F.2d 817 (5th Cir. 1960). Sin embargo, la fuerza persuasiva de estas opiniones no es decisiva si se considera que: 1) en la jurisdicción federal la violación de convenio no constituye una práctica ilícita de trabajo; 2) las situaciones han surgido en ocasión de la desafiliación de uniones locales de sindicales nacionales o internacionales; 3) se trata de proteger a uniones locales que se han desafiliado de organizaciones dominadas por elementos indeseables del bajo mundo o por comunistas; 4) la ley federal provee el procedimiento de decertificación para los casos de cismas genuinos dentro de la matrícula de las uniones, 29 U.S.C. sec. 159(e), y expresamente dispone que no se ordenará la celebración de nuevas elecciones hasta que haya transcurrido un año de la certificación de la unión que represente los obreros, 29 U.S.C. sec. 159(3). Véanse, *Disposition of Union Assets Upon Disaffiliation*, 33 Temp. L.Q. 152 (1960); *The Effect of a Change of Bargaining Representative*, 10 Lab. L.J. 845 (1959). Ninguna de estas circunstancias con-

---

([17]) En estos casos se considera como uno de los factores determinantes el hecho de que las cuotas deben beneficiar a los empleados que las pagan, criterio que es probablemente más adecuado cuando se trata de bienes adquiridos mediante la inversión de los fondos de la Unión.

curre en el presente caso. *Glove Workers Union* v. *Wisconsin Board*, 45 L.R.R.M. 2731 (1960), consideró una situación similar bajo la ley de relaciones del trabajo de dicho estado que define la violación de convenio como una práctica ilícita. Significativo por demás es el siguiente lenguaje, a la pág. 2736: "Consideramos, visto el propósito amplio de la Ley de Relaciones al investir a la Junta de Relaciones del Trabajo con la facultad de interpretar los convenios colectivos en la adjudicación sobre la existencia de 'prácticas ilícitas', incluyendo particularmente alegadas violaciones de 'los términos de un convenio colectivo' . . . que la Junta tiene el poder y el deber en este caso . . . de dictar *una orden determinando la disposición de los descuentos de cuotas en manos del patrono.*" (Énfasis nuestro.)

▮ Consideradas todas las circunstancias del presente caso, resolvemos que la orden de la Junta sobre la disposición de las cuotas descontadas es apropiada como un remedio incidental a un procedimiento de práctica ilícita. Tal vez constituye la única forma de reivindicar el interés público envuelto en la controversia. Cualquier otra solución sería invitar a que ante el menor asomo de la gestación o existencia de un cisma en la matrícula de una unión, real o aparente, y no empece la certificación extendida a la organización incumbente como agente exclusivo de los trabajadores, el patrono recurriera a la consignación de los descuentos, privando así a la unión reconocida de una administración efectiva de cualquier convenio vigente, atentando contra la propia vida de ésta y fomentando la disensión en grave detrimento de la estabilidad en el movimiento obrero. Esta situación es mucho más crítica en Puerto Rico en donde la experiencia nos enseña que el movimiento obrero es inestable y que con gran frecuencia sus energías se dedican más a las luchas intestinas que a la propagación de las ventajas de la unionización.

Un examen del expediente nos convence que la orden para que se entreguen las cuotas a la S.I.U. es razonable habida

cuenta que, independientemente del hecho de que indudablemente perdió la inmensa mayoría de la matrícula según reveló el resultado de las elecciones, continuó administrando el convenio según las circunstancias lo permitían. No hay razón alguna para privarla de estos fondos. También concurrimos en que los efectos de la disposición deben extenderse hasta la fecha en que se certificó a la U.T.A.M.A. como representante exclusivo de los trabajadores, pues como se apunta en el alegato de la Junta, el hecho de la deserción no entraña la pérdida del carácter representativo que ante el patrono ostenta la unión incumbente. Además, existe el peligro de que otra solución vulnere la eficacia de una certificación y constituya una invitación a los trabajadores para que cambien frecuentemente de representante eludiendo así sus obligaciones con la unión. Deseamos aclarar expresamente que nada de lo aquí expuesto constituye solución para el caso en que esté envuelta la disposición de bienes, especialmente inmuebles, adquiridos por la unión con los fondos de los trabajadores.

Convenimos en que no es éste un caso apropiado para la imposición del pago de intereses, *J.R.T.* v. *Morales*, 89 D.P.R. 777 (1964); *Reserve Supply Corp.* v. *N.L.R.B.*, 317 F.2d 785 (2d Cir. 1963), 53 L.R.R.M. 2374, 2377.

La conclusión a que hemos llegado también nos releva de discutir si la U.T.A.M.A. podía intervenir en el presente procedimiento, aun cuando como cuestión de hecho tal oportunidad se le brindó ante la Junta, la cual no aprovechó, y ante este Tribunal.

Finalmente este recurso revela la necesidad apremiante de una revisión de la legislación sobre relaciones del trabajo para atemperarla a realidades que han surgido en el curso del desarrollo del movimiento obrero y la economía del país. La Junta ha descargado su misión eficientemente, pero muchas de sus soluciones tienen que ser hijas de la improvisación. Tal situación no es deseable para el organismo que administra

una política pública, y mucho menos para los obreros y los patronos. Todos tienen derecho a esperar certidumbre y seguridad sobre la extensión de sus respectivos derechos y facultades. Lo contrario sería perpetuar un estado de tanteo (*trial and error*) en los remedios y órdenes de la Junta. Corresponde a la Asamblea Legislativa la acción necesaria para encarar la situación.

*Se dictará sentencia poniendo en vigor la orden de la Junta de Relaciones del Trabajo y disponiendo la cesación de nuestra resolución paralizando los procedimientos ante el Tribunal Superior a que nos hemos referido en el curso de esta opinión.*

