JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, peticionaria, *v.* UNIÓN LOCAL 847, INDEPENDIENTE DE SANTA ISABEL, demandada.

*Número:* JRT-64-11     *Resuelto:* 19 de febrero de 1965

*J. B. Fernández Badillo, Procurador General, José Orlando Grau, Celia Canales de González,* y *Luis M. Rivera Pérez,* abogados de la peticionaria; *Jorge López Santiago,* abogado de la demandada.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

El convenio colectivo concertado en 6 de mayo de 1963 por Luce & Company, S. en C. y la Unión Local 847 Independiente de Santa Isabel, y que estaba en vigor durante los meses de enero y febrero de 1964, disponía en cuanto es pertinente para resolver el presente recurso, como sigue:

"La Unión reconoce que la administración, organización y operación de los trabajos en las fincas . . . es facultad exclusiva del Patrono sin limitación alguna, en tanto en cuanto no esté en conflicto con lo dispuesto en este Convenio." (Art. VI, inciso I)

"En el trabajo por unidad o incentivo el Patrono no tomará represalias contra ningún trabajador suspendiéndolo del trabajo ni discriminará en su contra porque se negare a realizar trabajo bajo este sistema, ni se responsabilizará a la Unión por la negativa de los obreros a realizar dicho sistema de trabajo." (Art. VI, inciso N)

"Durante la vigencia de este Convenio Colectivo no se empleará por parte de la Unión a cuyo empleo se contrae el mismo, el recurso de la huelga, ni se llevarán a cabo paralizaciones de trabajo con perjuicio de los intereses del Patrono . . . debiendo someterse toda disputa al Comité Local de Quejas y Agravios . . ." (Art. IX)

"El Patrono pagará a los obreros de campo y empacado de tomates durante la vigencia de este convenio colectivo salarios mínimos de acuerdo con la siguiente escala:

|  | Mayo 2 1963 | Mayo 2 1964 | Mayo 2 1965 |
|---|---|---|---|
| 1 Obreros no clasificados | 3.00 | 3.02 | 3.04[1] |

. . ." (Art. XI)

---

[1] Por disposición del Decreto Mandatorio Núm. 69 para la Industria del Tabaco y Frutos Alimenticios, 29 R.&R.P.R. secs. 245n–902 y 903, desde el 27 de enero de 1964 rige un salario mínimo de $0.38 por hora, o sea, $3.04 diarios, en todas las operaciones relacionadas con la siembra, cultivo, recolección y entrega del tomate al almacén o al mercado.

"Las labores de cultivo y otras labores que no ꞏestén bajo incentivo serán realizadas por todos los trabajadores incluyendo recogedores de tomates si son necesarios para ello . . ." (Art. XIII, inciso G).

Se observará que en adición a un salario básico por la jornada diaria de ocho horas de labor, se había implantado un sistema de pago por incentivo para aquellos trabajadores que voluntariamente desearen acogerse al mismo. En términos generales, este sistema proporcionaba un pago adicional por cada caja de tomates recogida por el obrero en exceso de cierta tareaꞏo cuota mínima. Originalmente la empresa pagaba diez centavos por cada caja recolectada en exceso de treinta, pero para la actividad que comenzó en 27 de enero de 1964 se suplantó el método considerándose para ello el tonelaje de producción por acre, ([2]) y se varió el sistema de recolección. ([3]) Estos cambios en el método para computar el pago y recolectar el producto produjeron descontento e insatisfacción entre los

[2] En efecto, el criterio básico descansaba en que en las piezas de mayor producción el esfuerzo y el tiempo invertido para separar los tomates de la planta y llenar cada caja era menor que en las áreas de menos producción. Copiamos a continuación la tabla de incentivos de 3 de febrero de 1964.

| Toneladas por Acre | Precio por Caja | Período de Recolección por Caja |
|---|---|---|
| 1–2 | $0.10 | .263 horas |
| 3–4 | 0.09 | .237 " |
| 5–6 | 0.08 | .211 " |
| 7–8 | 0.07 | .184 " |
| 9–10 | 0.06 | .158 " |
| 11–12 | 0.05 | .132 " |

La compensación variaba también dependiendo de si la caja era de madera o de plástico debido a la diferencia en capacidad existente entre ambas.

[3] El cambio se describe en la decisión de la Junta de Relaciones del Trabajo en la siguiente forma: "En lugar de trabajar en las diversas piezas ininterrumpidamente se optó por recoger el producto tan solo cuando estuviese maduro de suerte que se impidiera que los trabajadores destruyeran las matas al pasar en su recorrido por dentro de la finca. El resultado del cambio de método era el de que se realizaban menos recogidas en cada pieza."

trabajadores y su liderato, por entender que ello mermaba la compensación que hasta entonces percibían. Como consecuencia de ello se produjo un paro en las actividades de recolección. La Junta determinó—con base suficiente en el récord—que la Unión decretó una huelga en perjuicio de los intereses del patrono, y concluyó que había incidido en una violación de la cláusula del convenio que impedía recurrir a la huelga.

En tal virtud, en 11 de junio de 1964 dictó una orden dirigida a la organización obrera para que cesara y desistiera de en manera alguna violar los términos del convenio colectivo que tiene firmado o que firme con Luce & Company, S. en C., en la siembra, cultivo, recolección y empaque de tomates, y requiriéndole, además, como acción afirmativa la fijación de ciertos avisos. En octubre 5 solicitó de este Tribunal que se pusiera en vigor la orden. [4]

En su comparecencia la Unión sostiene que los cambios introducidos unilateralmente por el patrono en el sistema de incentivos eran materia de discusión entre las partes, a lo cual la empresa se negó a pesar de los requerimientos que le fueron hechos, y que esta negativa a negociar justifica la actitud de la organización obrera al estimular o decretar el paro en violación de los términos del convenio. Apóyase en *Mastro Plastics Corp.* v. *N.L.R.B.*, 350 U.S. 270, 100 L.Ed. 309 (1956).

■ La dificultad con que se tropieza esta posición que asume la Unión es que el paro decretado no respondió a la supuesta comisión por el patrono de la práctica ilícita de negativa a negociar. La prueba demuestra hasta la saciedad que tal actividad obedeció únicamente a factores puramente económicos, o sea, a la alegación de la organización obrera de que el cambio del método de recolección dentro del sis-

---

[4] La Unión instó a su vez una petición para revisar la orden dictada. Hasta esta fecha nada ha hecho para proseguir diligentemente con su recurso. Como las cuestiones suscitadas son idénticas, presumimos que su posición corresponde con la que ha adoptado en el presente caso.

tema de incentivos operaba en perjuicio de algunos de sus afiliados. Este hecho sería suficiente para distinguir la situación que consideramos de la de *Mastro Plastics Corp.*, supra. Tratábase allí de dos patronos—en cuyos convenios se había incluido una cláusula impidiendo a la unión recurrir a la huelga—que despidieron un miembro de la unión debido a la actividad desplegada por éste para respaldar la organización certificada frente a otra favorecida por los patronos. El despido precipitó una huelga dentro del término de sesenta días de haber la unión certificada notificado su deseo de renegociar y modificar el convenio. Frente a las alegaciones de la unión de que el despido constituía una práctica ilícita por ser discriminatorio, se alegó *inter alia* por los patronos que la huelga era ilegal por violar la cláusula aludida del convenio. El Tribunal Supremo federal sostuvo que la disposición renunciando a la huelga impedía únicamente a los trabajadores declararse en huelga para lograr beneficios económicos—sobre salarios, jornada de trabajo y otras condiciones del empleo—pero que no se extendía a aquellos casos en que se trataba de protestar y lograr que el patrono descontinuara en la comisión de prácticas ilícitas.[5] *N.L.R.B.* v. *Fitzgerald Mills Corporation*, 313 F.2d 260 (2d Cir. 1963); *N.L.R.B.* v. *Buitoni Foods Corp.*, 298 F.2d 169 (3d Cir. 1962); *National Labor Rel. Bd.* v. *Giustina Bros. Lumber Co.*, 253 F.2d 371 (9th Cir. 1958). Véanse, comentarios sobre el caso *Mastro* en 7 Vill. L. Rev. 489 (1962); 6 Buffalo L. Rev. 329 (1957); 55 Mich. L. Rev. 296 (1956).

■ Por otro lado no debe olvidarse que nos encontramos nuevamente frente a una situación en que la práctica ilícita imputada es la de violación del convenio colectivo, que no se considera como tal bajo la legislación federal. Cf. *J.R.T.* v.

---

[5] Por ser innecesario no discutimos la situación que surge cuando una huelga en su orígenes económica se torna por la conducta observada por el patrono durante el curso de la huelga en una sobre prácticas ilícitas. Para los interesados, consúltese, Stewart, *Conversion of Strikes: Economic to Unfair Labor Practice*, 45 Va. L. Rev. 1322 (1959).

*A.M.A.*, 91 D.P.R. 500 (1964); *P.R. Telephone* v. *Junta Rel. Trabajo*, 86 D.P.R. 382 (1962); *Junta Rel. del Trabajo* v. *I.L.A.*, 73 D.P.R. 616 (1952). De ahí que aunque una huelga provocada por las prácticas ilícitas del patrono no priva a los partícipes en ella de los beneficios de las actividades protegidas tales como reposición en el empleo, paga atrasada y otros, en Puerto Rico no inmuniza *ipso jure* por una violación del convenio porque la propia ley al disponer que ello constituye práctica ilícita de una unión confiere facultad discrecional a la Junta para declarar sin lugar cualquier cargo por este motivo cuando el patrono que es parte en el contrato es culpable de una violación en curso del convenio. Art. 8(2)(a), 29 L.P.R.A. sec. 69(2)(a) ([6]) Es una cuestión prevista por el estatuto. Para los remedios que asisten a un patrono en la jurisdicción federal por la violación de una cláusula de no huelga, véase, *Employer Remedies For Breach of No-Strikes Clauses*, 39 Ind. L.J. 387 (1964). Y en este caso aun cuando la Junta apreció que "el espíritu del convenio era el de que no se hicieran estas alteraciones sin la previa consulta a la

---

([6]) En los casos de huelgas en violación de cláusulas de convenio mediante las cuales la unión renuncia a recurrir a huelgas, se ha sostenido que generalmente se trata de una materia sujeta a arbitraje y las acciones por daños se han paralizado hasta que se termina el procedimiento de arbitraje. *Yale & Towne Mfg. Co.* v. *International Assoc. of Machinists*, 299 F.2d 882 (3d Cir. 1962); *Signal-Stat Corp.* v. *United Electrical, R.&M.W.*, 235 F.2d 298 (2d Cir. 1956).

En *Drake Bakeries* v. *Local 50*, 370 U.S. 254, 265 (1962), se dice: "Esta Corte sostuvo en Mastro Plastics Corp. v. N.L.R.B., 350 U.S. 270, 100 L. ed. 309, 76 S. Ct. 349, que el patrono no tenía derecho a sustituir empleados que se han declarado en huelga para protestar contra la comisión por el patrono de prácticas ilícitas, a la luz de una cláusula de no huelga. Se dijo que, a pesar de la amplia prohibición contractual de las huelgas, las partes no podían haber intentado incluir la renuncia del derecho de los obreros a declarar una huelga en relación con una flagrante práctica ilícita patronal, en ausencia de una declaración expresa a tales efectos . . . Mastro . . . envolvía una flagrante práctica ilícita del patrono que amenazaba la existencia misma de la unión. *Una huelga en violación del contrato no constituye per se una práctica ilícita . . .*"

Unión" (7) sin que ello significara que el patrono "violara los términos del convenio colectivo desde un punto de vista legal," en el ejercicio de la discreción que le confiere la disposición citada, estimó que considerados los méritos del asunto, no era condonable la actuación de la Unión.

*Se dictará sentencia poniendo en vigor en todas sus partes la orden emitida por la Junta de Relaciones del Trabajo en 11 de junio de 1964.*

---

(7) Aun presumiendo que en este sentido el patrono hubiese incurrido en una práctica ilícita, la obligación de la Unión era recurrir al procedimiento de arbitraje provisto por el convenio. Cf. *Packinghouse Workers* v. *Needham,* 376 U.S. 247 (1964); *United Steelworkers* v. *American Internat'l Aluminum Corp.,* 334 F.2d 147 (5th Cir. 1964); *cert. den.* 379 U.S. 991, 33 U.S.L. Week 3251. Son las uniones obreras las que generalmente han interpuesto como defensa la necesidad de árbitros en pleitos de daños bajo la Sec. 301 de la Ley federal. Para una excelente exposición del problema, véase, Stewart, *No-Strike Clauses in the Federal Courts,* 59 Mich. L. Rev. 673 (1961), especialmente a la pág. 693 y ss.